IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PAUL WILLIAMS,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **CARSON CONCRETE CORPORATION** | **NO.  20-5569** |
| **AND ANTHONY J. SAMANGO, JR.** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Paul Williams, a black man, applied for one of two jobs with Carson Concrete Corporation ("Carson") to operate a tower crane on the jobsite of a structural concrete low rise building under construction in Philadelphia.  When both positions were given to white men, he brought this suit alleging that Carson and its Chairman, Anthony Samango, Jr. ("Samango, Jr."), had discriminated against him on the basis of race.  He claims that Defendant Carson violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the Pennsylvania's Human Relations Act, 43 Pa. C.S. § 951 *et seq.* ("PHRA"); as well Philadelphia's Fair Practices Ordinance, Phila. Code 9-1100 *et seq.* ("PFPO"), and that Samango, Jr., in his individual capacity, violated Section 1981, the PHRA, and the PFPO.  Defendants have filed a Motion for Summary Judgment on all of the claims.  As set forth below, the Motion will be granted as to Samango, Jr. and denied as to Carson.

### I.    FACTS

Carson is a subcontractor that specializes in the construction of concrete structural forms for high-rise buildings.  Carson hires workers to operate different kinds of cranes at its jobsites.

Crane operators are unionized workers and do not apply for open positions using paper applications or email.  Instead, applicants can either seek out these jobs through "open solicitation" or wait for an offer from the Union.  An applicant engages in open solicitation by visiting the jobsite, obtaining the name of the employer from the project contractor, and approaching that company about the position.  The Union also keeps a list of out-of-work operators to whom it offers work as requests come in from contractors.

In the Fall of 2019, Carson was looking to fill two tower crane operator positions at the jobsite for "the Laurel," a low-rise building on Walnut Street in Philadelphia.  Only tower crane operators who are members of the International Union of Operating Engineers, Local 542 ("Local 542" or "the Union") and hold the proper certifications are considered "qualified" to work with Carson.

Williams is a qualified tower crane operator and has been a member of Local 542 since June 25, 2001.  He has been operating tower cranes since 2007 and had been hired for a Carson job off the Union's on-call list once before, in 2015 (although Williams quit that job with no notice after two weeks).  In addition, the Union had called Williams to offer him a Carson job in September, 2019, but had not received a response from him.  Nevertheless, in Fall 2019, Williams was looking for work, and specifically, work operating tower cranes.

On September 11, 2019,[1] Williams initiated open solicitation by visiting the Laurel site,

---

[1] "[V]iew[ing] the facts and draw[ing] reasonable inferences in the light most favorable" to Plaintiff, *Scott v. Harris*, 550 U.S. 372, 378 (2007), as is required at summary judgment, Williams visited the Laurel in September 2019. Although Defendants maintain that Williams spoke with Green in November 2019, Green testified that Williams came to see him approximately in September 2019 and that he did not recall meeting him again in November. Williams also submitted evidence that he telephoned Samango III on September 11, 2019, and this date is consistent with the facts recounted by Williams to the EEOC.

where he spoke with the Project Manager Gerald Green about getting hired as a tower crane operator for the project.[2]  Green told Williams that Carson's President, Anthony J. Samango, III,[3] would be in charge of hiring tower crane operators at the Laurel.  Williams called Samango, III that day and was told that he had not yet considered any applicants for the two tower crane operator positions at the Laurel, but would return Williams' call when he could.  Green had also told Williams to head over to the intersection of Broad and Spruce Streets, where Carson was on-site for another project, and talk to Carson's supervisor about the operator position for the Laurel directly.   Williams did not, however, go to the jobsite.

A few weeks later, Williams went to Carson's corporate offices in Boothwyn, Pennsylvania, where he spoke with an employee about the job who suggested he go talk to Carson's foreman Bob Hart at the Broad and Spruce location.  Williams headed over there and met with Hart who told him that the tower crane operator positions at the Laurel had already been filled.  Like Williams, the two men who got the jobs were certified tower crane operators and Local 542 members and whose qualifications, according to Williams, were "essentially equal" to his own.[4]  Unlike him, they were white.

Plaintiff alleges that Defendants discriminated against him on the basis of his race by failing to hire him for one of the tower crane operator positions at the Laurel.[5]

---

[2] Green works not for Carson, but for the Laurel's general contractor, Hunter Robert Construction Group.

[3] Samango, III is not a defendant, but he is the son of named defendant Samango, Jr.  Williams has apparently never met, spoken to, or had any communications with defendant Samango, Jr.

[4] Both men had slightly more seniority at the Union but had not been operating tower cranes for as long as Williams.

[5] Plaintiff also alleged that he suffered discrimination in connection with Defendants' failure to hire him for another Carson jobsite called "Arthaus."  However, he conceded at his deposition and in his Opposition to Defendants' Statement of Material Facts in Support of the Motion for Summary Judgment that he never applied for a job at the

3

## II.   LEGAL STANDARDS

### A.  Summary Judgment

To prevail on a summary judgment motion, "the movant must show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [the] burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A "scintilla of evidence" will not suffice to defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252.  There must be evidence permitting "reasonable jurors [to] find by a preponderance of the evidence that the plaintiff is entitled to a verdict."  *Id.*

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue.'"  *Id*. at 324.  "The non-moving party may not merely deny

_____

Arthaus site, and that he had no interest in that job.

the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256.  The evidence adduced by the non-moving party need not be in a form admissible at trial.  *Celotex Corp.*, 477 U.S. at 324.

If the movant bears the burden of proof at trial, summary judgment should not be granted "unless a reasonable juror would be compelled to find [the movant's] way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id*.

In evaluating the motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations marks and alterations omitted).  "Summary judgment is to be used sparingly in employment discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).

## B.  The Statutory Framework

For the purposes of a summary judgment motion, the standards applicable to discrimination claims under Section 1981, Title VII, and the PHRA are the same. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409-10 (3d Cir. 1999).  The same logic applies to the PFPO, which addresses similar substantive issues and adopted substantially the same language as its state and federal counterparts.[6] *See In re Tribune Media Co.*, 902 F.3d 384 (3d Cir. 2018) (applying Title

---

[6] *Compare* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer—(1) to fail or

VII framework to a case that also included claims under the PHRA and PFPO); *Hong v. Temple Univ.*, No. 98-4899, 2000 WL 694764, at *9 (E.D. Pa., May 30, 2000) (applying Section 1981 framework to PFPO claims), *aff'd,* 261 F.3d 492 (Table) (3d Cir. 2001).[7]

Federal statutory claims based on indirect evidence of discrimination in hiring implicate the application of the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Comcast Corp. v. Nat'l Ass'n of African-Am. Owned Media*, 140 S. Ct. 1009, 1019 (2020). That framework proceeds in three steps: "First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence

---

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."), *with* Phila. Code 9-1103(1) ("It shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her race, ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status, including, but not limited to, the following: (a) For any employer to refuse to hire, discharge, or otherwise discriminate against any individual, with respect to tenure, promotions, terms, conditions or privileges of employment or with respect to any matter directly or indirectly related to employment."), *and* 43 Pa. C.S. § 955 ("It shall be an unlawful discriminatory practice . . . :(a)  For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.").

[7] The Third Circuit agreed with this approach in an unpublished case, *Darby v. Temple Univ.*, 786 Fed. App'x 368, 369 n.5 (3d Cir. 2019) ("The Philadelphia Fair Practices Ordinance uses the same language and framework as Title VII and therefore the Title VII analysis applies to this claim as well.") (citing *Hong*, 2000 WL 694764, at *9). Sister district courts have taken the same tack. *See, e.g.*, *Vandegrift v. City of Phila.*, 228 F. Supp. 3d 464, 480, 486 n.206 (E.D. Pa. 2017) (applying Title VII framework to PFPO claims); *Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (same).

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410 (internal citations and quotation marks omitted) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).[8]  "[T]he elements of a prima facie case depend on the facts of the particular case." *Id.* at 411.

To establish that the defendant's reasons are pretextual and defeat a motion for summary judgment, the plaintiff must "submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a . . . determinative cause of the employee's termination." *C.A.R.S. Prot. Plus, Inc.*, 527 F.3d at 370 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  The plaintiff "may do this through direct or circumstantial evidence of falsity or discrimination." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995).  The analysis focuses "not on individual incidents, but on the overall scenario." *Shaner v. Synthes*, 204 F.3d 494, 503 n.9 (3d Cir. 2000) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997)).

To satisfy the first prong, the plaintiff must do more than show that the employer's

---

[8] Although Carson concedes that the *McDonnell Douglas* framework applies to all of Williams' claims, it also argues that the Section 1981 claim must fail—apparently, regardless of how it fares under *McDonnell Douglas*—due to insufficient evidence of discriminatory intent.

Carson is incorrect; the application of *McDonnell Douglas* determines whether Williams' Section 1981 claims will survive summary judgment. Its position to the contrary is at variance with Third Circuit precedent holding that Section 1981 claims are analyzed under *McDonnell Douglas*.  *See, e.g.*, *Jones*, 198 F.3d at 409-10.  The Supreme Court's decision in *Comcast Corp.* did not hold otherwise.  *Comcast Corp.*, 140 S. Ct. at 1019 (holding, without deciding whether *McDonnell Douglas* applied, that a Section 1981 plaintiff must prove but-for causation).  And Defendant listed no cases to the contrary—the cases it cited simply do not address this question.  *See Gen. Bldg. Contractors Ass'n, Inc. v. Penn.*, 458 U.S. 375, 389 (1982) (holding that Section 1981 imposes liability for intentional discrimination but not for unintentional disparate impacts); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411 (3d Cir. 2003) (holding that *Rooker-Feldman* doctrine did not bar Section 1981 claims based on theory of selective prosecution).

decision was wrong; he or she must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 764). Even "somewhat contradictory" evidence may reveal a triable issue of fact. *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (evidence of plaintiff's average numerical rating and sales bonus was "somewhat contradictory" with his termination, precluding summary judgment on age discrimination claims). Plaintiff need only present "evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." *Sempier*, 45 F.3d at 731.

"A plaintiff is not required to produce evidence which *necessarily* leads to the conclusion 'that the employer did not act for nondiscriminatory reasons.'" *Sempier*, 45 F.3d at 728 (emphasis added) (quoting *Sorba v. Penn. Drilling Co*., 821 F.2d 200, 205 (3d Cir. 1987), *cert. denied*, 484 U.S. 1019 (1988)). Even if the employer's actions "may have been innocent," the query is whether a jury would "reasonably question" whether the explanations provided are fabricated. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 497 (3d Cir. 1995). If the answer is yes, the motion for summary judgment will be denied.

## III. DISCUSSION

### A. Liability of Individual Defendant Samango, Jr.

Samango, Jr. seeks summary judgment of the claims made against him under Section 1981, the PHRA, and the PFPO. Individuals may be found liable for discrimination under Section 1981 if they are "personally involved" in the discrimination and "intentionally caused"

infringement of the plaintiff's rights, or if they "authorized, directed, or participated in the alleged discriminatory conduct." *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604 (1987). It is unlawful under the PHRA and the PFPO for any individual to "aid, abet, incite, compel or coerce" a prohibited discriminatory act. 43 Pa. C.S. § 955(e); Phila. Code § 9-1103(1)(h).

Williams has alleged no facts concerning the personal involvement of Samango, Jr. in any hiring decisions let alone a decision not to hire him, and has presented no evidence that Samango, Jr. aided, abetted, incited, compelled, or coerced any discriminatory act against him. Specifically, Samango, Jr testified at his deposition that his role at Carson is advisory and that he does not give advice about hiring:

Q. What is your role at Carson Concrete Corporation?

A. Chairman.

Q. What does the chairman do?

A. Give advice.

[. . .]

Q. What day-to-day operations do you involve yourself in?

A. Giving advice. I don't do — I don't have tasks that I do.

Q. What type of advice do you give?

A. Good advice.

Q. Work advice?

A. Sure.

Q. About?

A. Construction estimates, construction procedures, scheduling. Anything

9

that has to do with the business.

Q. Are you involved in hiring?

A. Never. Not never, not in 20 years.

Q. Who handles the hiring?

A. I don't know. I don't give advice on hiring.

Even assuming, as Plaintiffs would have it (because Samango, Jr. knew that Carson had previously employed Williams through the Union's list and because he signed a letter responding to Plaintiff's EEOC Charge) that Samango, Jr. *did* have some role in Carson's hiring, there is no evidence in the record that he was involved in the decision not to hire Williams for the positions at issue here.  Accordingly, Defendant Samango, Jr.'s Motion for Summary Judgment will be granted with prejudice.

### B.  Liability of Carson

When, as here, the complaint alleges a discriminatory refusal to hire on the basis of race, to make out a prima facie case a plaintiff must show: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."  *McDonnell Douglas Corp.*, 411 U.S. at 802.

The Parties do not dispute that Williams belongs to a protected class, that he is a qualified tower crane operator, and that he was not hired.  Therefore, Williams need only, at this stage of the *McDonnell-Douglas* framework, present sufficient evidence that he applied for a job for which Carson was seeking applicants and that the position remained open after his rejection with

10

Carson continuing to seek applicants from tower crane operators who had the same qualifications he did.  Viewing the facts and drawing all reasonable inferences in favor of Williams as the party opposing summary judgment, the evidence is that he applied in September 2019, while Carson was still seeking applicants, did not get the job, and that two white men were hired rather than him.[9]  This meets his initial burden under *McDonnell Douglas*.

Carson maintains that it had a legitimate, non-discriminatory reason for not hiring Williams: to wit, he had proven himself unreliable in the past.  It refers specifically to an incident in 2015 when it hired Williams as a tower crane operator for a job that was supposed to last for nine months:  Williams quit with no notice after two weeks, leaving Carson scrambling to find a replacement.  The reason is legitimate, thus the burden shifts back to Williams to show that it is a pretext.

While Williams admits that he did quit after two weeks and with no notice, he questions whether Carson was left scrambling to fill the job in that he left on a Thursday or Friday and his replacement started working on the following Monday.  But, his argument that Carson's failure to fire him is pretextual rests on other grounds: (1) it hired two white men who "shared essentially equal qualifications" with him after it became aware of his interest in the position; and, (2) it did nothing to *prevent* the Union from offering him a job with Carson on a different project.

The mere fact that Carson hired two white men instead of Williams is not alone sufficient

---

[9] Carson also asserts that it did not to hire Williams because it had already filled the positions by the time he applied. As stated *supra*, drawing all reasonable inferences in Plaintiff's favor, he opened solicitation for the Laurel tower crane operator position in September 2019, at which time Samango III informed him that the positions were still open.

to establish pretext—otherwise, pretext would be demonstrated in every case where the plaintiff was replaced by individuals outside the protected class.[10]  Williams' second argument—that an inconsistency in Carson's story casts doubt on its purported reason for not hiring him—packs a stronger punch.  If Carson was so set against hiring Williams because he was unreliable, Plaintiff argues, the Union would not have offered him a position with Carson in September 2019, because Carson would have told the Union not to do so.  Carson contends that the September 2019 job was different because Williams did not apply for it and it was for a "rough terrain" crane operator instead of a tower crane operator—but it does not explain why William's reliability (or lack thereof) would be a factor for one job but not the other.  While this anomaly would not necessarily lead a jury to conclude that Carson's reason is pretextual, that is not the standard,  *Sempier*, 45 F.3d at 728: Given the circumstances a jury could *reasonably* conclude that Carson's assertion that Williams is too unreliable to be employed is unworthy of credence. *Jones*, 198 F.3d at 413.  Accordingly, Carson's Motion for Summary Judgment will be denied.

### C.  Mitigation of Damages

Defendants also argue that, "even if Plaintiff could demonstrate a right to a jury trial, Williams would not be entitled to backpay damages" because he did not fulfil his duty to mitigate his damages.

Upon a finding of unlawful discrimination, Title VII authorizes an award of damages, including back pay.  *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir. 1995).  The

---

[10] By the same logic, Carson's assertion that it hired a black man as a tower crane operator at a different site does not establish that they did not discriminate against Williams.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) ("an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class").

successful claimant, however, has a duty to mitigate his or her damages, and the back pay award may be reduced by "amounts earnable with reasonable diligence." *Id.* (quoting 42 U.S.C. § 2000e–5(g)(1)).  Whether or not the plaintiff has satisfied the duty to mitigate is a question of fact.  *Id*.

Although the duty to mitigate lies with the plaintiff, the failure to mitigate damages is an affirmative defense for which the defendant bears the burden of proof.  *Anastasio v. Schering Corp.*, 838 F.2d 701, 707 (3d Cir. 1988).  To carry its burden, the defendant must introduce evidence establishing that substantially equivalent positions were available and the plaintiff failed to exercise reasonable diligence in attempting to secure them.  *Id.* at 708.  "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated."  *Taylor Milk Co., Inc.*, 64 F.3d at 866 (quoting *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)).

Carson has not met its' burden here.  Although it provides evidence that Williams was offered jobs but either did not respond to calls regarding the jobs or turned them down, it provides no specifics regarding whether the positions were substantially equivalent to the ones for which they refused to hire him including the hours, duration of the contract, job responsibilities, type of work and associated status.[11]  Accordingly, its Motion for Summary Judgment on its affirmative defense of failure to mitigate damages shall be denied.

---

[11] Because Carson has not carried its burden on the first prong of the test, the question of Williams' "reasonable diligence" need not be addressed.

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.

14